Filed 7/11/24  P. v. Mansilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>NOEL MANSILLA,<br><br>　　Defendant and Appellant. | F087309<br><br>(Super. Ct. No. 1467647)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Rex Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]　　Before Detjen, Acting P. J., Peña, J. and Meehan, J.

## INTRODUCTION

Appellant and defendant Noel Mansilla (defendant) was convicted of first degree murder and other offenses. He was sentenced to two years four months plus 75 years to life. The trial court subsequently recalled defendant's sentence pursuant to Penal Code[1] section 1172.75, dismissed the sentence imposed for the prior prison term enhancement, and resentenced him to one year four months plus 75 years to life.

On appeal from the resentencing, defendant's counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436; *People v. Delgadillo* (2022) 14 Cal.5th 216.) Defendant has not filed a supplemental brief. We affirm.

## FACTS[2]

"Defendant and Priscilla Flores were married in 2003 and had three children together. Flores told defendant in 2007 she was ending their relationship and they separated. Flores met [Adolfo] Sandoval in 2010 and they started living together the following year along with Flores's children. Defendant was upset when Flores told him Sandoval had moved in with her.

"During a phone conversation on June 21, 2013, defendant told Flores he wanted Sandoval to meet with him around the corner from her residence. There was a restraining order directing defendant to stay away from Flores's home. Flores denied Sandoval had told defendant he could not see his children or had told defendant he did not ' "know who [he was] messing with." ' Flores did not hear anyone threaten defendant. Flores's

---

[1] All further statutory citations are to the Penal Code.

[2] The following facts are from this court's nonpublished opinion in *People v. Mansilla* (Feb. 6, 2018, F072898) (*Mansilla I*), that corrected the abstract of judgment and otherwise affirmed defendant's direct appeal. It was filed as an exhibit in support of the prosecution's opposition to defendant's motion for resentencing, and considered by the trial court when it denied defendant's motion.

2.

mother, Maria Barrera, also heard the phone conversation and denied Sandoval said these things to defendant.

"About two hours after they talked on the phone, Flores saw defendant slowly drive by her house. After passing Flores's house and seeing Flores, defendant accelerated and then made a U-turn back toward the house; Flores ran into the house and called 911. Flores's youngest son, her mother, and her sister-in-law were in the house. Sandoval was in the backyard.

"Defendant entered Flores's kitchen and demanded to know who threatened him. Flores and her son told him to leave. Defendant told Sandoval he would kill him. Sandoval was still in the backyard when defendant threatened him. Barrera tried to tell Sandoval and Flores that defendant was holding a gun behind his leg but she was unsure whether they heard her warning. Barrera went next door to call the police from the neighbor's phone.

"Flores had already contacted 911 and was holding the phone in her hand as defendant made his threat. The 911 recording was played for the jury and the jury received a transcript of the recording. During the recording, defendant can be heard saying to Sandoval, 'I'll kill you,' 'I'll kill you, fool,' 'I'll kill you, motherfucker.' Flores can be heard repeatedly telling defendant to get out of her house. As the call progresses, Flores says, 'What the fuck?' before making an inaudible comment followed by 'No. No. No.' When the 911 dispatcher asks for a response after another inaudible statement from Flores, Flores responds, 'I need an ambulance right away.'

"Flores explained that after she yelled at defendant to get out of her house, defendant kissed their son and pulled out a black semiautomatic gun from his rear pants pocket. Defendant pushed Flores to the ground as she tried to stop him. As Flores was getting back up, defendant started shooting at Sandoval, who was still in the backyard. Sandoval took off running toward the side of the house where there was a gate to the front. Defendant ran after Sandoval, with Flores and her son following behind. As

3.

Sandoval rounded the corner of the house, defendant was still shooting at him. Flores had thrown her cell phone at defendant, attempting to stop him.

"Sandoval made it through the gate on the side of the house and into the front yard with defendant following him. When they got to the front yard, defendant continued shooting at Sandoval as Sandoval had his palms on the ground and was down on one knee. Flores and her son were yelling at defendant to stop. Defendant told his son he loved him, kissed him again, ran to a car, and fled the scene. There was no physical altercation between Sandoval and defendant. Sandoval was not armed with a gun or knife.

"Sandoval was not moving and had gun[shot] wounds to his torso and right arm. He had difficulty talking and answering the officers' questions. When asked who shot him, Sandoval replied, ' "It was her son-in-law." ' Sandoval was transported to the hospital by ambulance where doctors and nurses attended to him until they called a time of death. An autopsy revealed Sandoval was hit by two bullets: one through the right forearm and the other entered his back, exiting his chest…. The medical examiner concluded Sandoval died from blood loss caused by the bullet wound to his abdomen.

"Aimee De La Torre, defendant's long-time friend, disposed of defendant's gun. Defendant told De La Torre he shot Sandoval. De La Torre dropped off defendant at a motel in Modesto." (*Mansilla I*, *supra*, F072898.)

**Defense Case**

"One of the investigating officers questioned Maria Barrera, who told the officer that when defendant entered the house he said, ' "These are my kids." '

"Defendant testified that on the day of the shooting he was drinking vodka and orange juice after lunch. Defendant could not recall how many drinks he had. Defendant called Flores more than once because he wanted to see his children. Defendant spoke with Sandoval on the phone and told him, 'Don't get in between me and my kids, mother fucker.' Sandoval replied, ' "You don't know who you're fucking with." ' Defendant

4.

said he was drinking during this conversation. When asked whether he was angry or sad that day, defendant replied, 'Mad. I was mad.' Defendant thought Sandoval's comment was a threat that Sandoval would not let defendant see his children. Defendant also thought Sandoval's comment implied Sandoval thought he was better than defendant.

"Defendant explained when he walked into Flores's house, he told Sandoval, 'Who are you threatening, mother fucker? This is my family. These are my kids.' Defendant could not remember how much time passed between his phone call and when he arrived at Flores's house. Defendant could not remember if he continued to drink during that interval. Defendant said he had bought a pint of vodka that day and drank the whole thing. Defendant drove De La Torre's car to Flores's home.

"Defendant said that he was enraged when he reached Flores's home. Defendant wanted Sandoval to know it was defendant's family. Defendant did not remember Sandoval saying anything, but explained he was shouting at Sandoval that it was defendant's family and kids. Defendant admitted he had brought a gun but remembered nothing that happened after he yelled at Sandoval until he was at the motel. The police woke defendant. Defendant said he had only wanted to confront Sandoval face-to-face because Sandoval had disrespected him and would not continue the phone conversation. Defendant denied he went to Flores's house to beat up Sandoval, hurt him, or kill him.

"During cross-examination, defendant said he knew how his gun worked and shot the gun one time the day before killing Sandoval. Defendant said he obtained the gun in October or November of 2012." (*Mansilla I*, *supra*, F072898.)

## PROCEDURAL BACKGROUND

In 2015, defendant was convicted after a jury trial of count 1, first degree murder (§ 187, subd. (a)), with an enhancement for personal discharge of a firearm (§ 12022.53, subd. (d)); count 2, felon in possession of a firearm (§ 29800, subd. (a)(1)); and one prior strike conviction (§ 667, subd. (d)) and one prior prison term enhancement (§ 667.5, subd. (b)).

5.

At his sentencing hearing, the trial court denied defendant's request to dismiss the prior strike conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. He was sentenced to an aggregate term of two years four months plus 75 years to life: 25 years to life, doubled to 50 years to life as the second strike term for count 1, first degree murder; plus a consecutive term of 25 years to life for the firearm enhancement; and consecutive terms of one year four months for count 2, and one year for the prior prison term enhancement.[3]

### DEFENDANT'S DIRECT APPEAL

In 2018, this court filed the nonpublished opinion in defendant's direct appeal, ordered the trial court to correct the abstract of judgment, and affirmed the judgment as corrected. (*Mansilla I*, *supra*, F072898.)

We rejected defendant's arguments of prosecutorial misconduct and ineffective assistance of counsel. (*Mansilla I*, *supra*, F072898.)

We also rejected defendant's argument that the trial court abused its discretion when it denied his request to dismiss the prior strike conviction: "Given defendant's pattern of relatively recent serious criminal activity and his willful violation of a lawful restraining order, we cannot say defendant fell outside the spirit of the ["Three Strikes"] law or that the trial court abused its sentencing discretion" in denying the request. (*Mansilla I*, *supra*, F072898.)

Also on appeal, defendant argued remand for resentencing on his firearm enhancement was required as a result of amendments enacted by Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620). At the time of defendant's sentencing hearing, the imposition of a firearm enhancement under section 12022.53 was previously mandatory and could not be stricken in the interests of justice pursuant to section 1385 or

---

[3] This court has granted the trial court's request to take judicial notice of the reporter's transcript for defendant's sentencing hearing, that was filed as part of the record in defendant's direct appeal.

any other provision of law.  Effective January 1, 2018, section 12022.53 was amended by Senate Bill 620 to give discretion to the trial court to strike firearm enhancements. (*People v. Baltazar* (2020) 57 Cal.App.5th 334, 337.)  Section 12022.53, subdivision (h) now states:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  This amendment applies retroactively "only to nonfinal judgments or to final judgments where the defendant is being resentenced under some other law."  (*Baltazar*, at pp. 340–341.)

We acknowledged the amendments were retroactive since defendant's case was not final, and remand was required if the record was ambiguous as to whether the trial court would have exercised such discretion to dismiss the enhancement if it had the authority at the time of the sentencing hearing.  "There are cases, however, where the trial court's intent to impose the maximum sentence is so clear and unambiguous that no purpose would be served in remanding the case.  [Citation.]  This is such a case." (*Mansilla I*, *supra*, F072898.)

"The [sentencing] court observed that if defendant, a felon, had not had a firearm available, the crime would not have occurred.  Because of this, the court thought it was 'appropriate to sentence him consecutively for a total sentence, which is the maximum allowable under the law, of 77 years … and 4 months to life.'  The court further commented:  'This crime was a terrible crime.  The victim was shot without provocation in his home in front of the defendant's child as well as Priscilla Flores and her mother.' The court added defendant had a long criminal history, including the strike priors, 'and this case calls for the strongest possible sentence.'

"The trial court clearly considered other ways to reduce defendant's sentence, including granting his *Romero* request and making his sentence on count 2 concurrent. The court rejected these forms of leniency.  Furthermore, the court was specifically

disturbed that defendant was a felon who committed a crime the court described as terrible, without provocation, and in front of his own son as well as the child's mother and grandmother. The court specifically sought to impose 'the strongest possible sentence.' Given these findings and observations, this record clearly demonstrates the trial court would not exercise its sentencing discretion in any different fashion, nor is there any possibility the court would strike the firearm enhancement." (*Mansilla I*, *supra*, F072898.)

## RECALL OF DEFENDANT'S SENTENCE

On September 25, 2023, defendant's counsel filed in the trial court a "Resentencing Brief and Invitation for the Court to Strike and/or Dismiss Enhancements" pursuant to section 1172.75. "Prior to January 1, 2020, section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation the defendant had served a separate prior prison term and had not remained free of custody for at least five years. [Citation.] Effective January 1, 2020, Senate No. Bill 136 (2019–2020 Reg. Sess.) [citation] … amended section 667.5 by limiting the prior prison term enhancement to only prior terms for sexually violent offenses. [Citations.] Enhancements based on prior prison terms served for other offenses became legally invalid. [Citation.] The amendment was to be applied retroactively to all cases not yet final on January 1, 2020." (*People v. Burgess* (2022) 86 Cal.App.5th 375, 379–380 (*Burgess*).)

"Later, in 2021, the Legislature enacted Senate Bill No. 483 (2021–2022 Reg. Sess.) …. This bill sought to make the changes implemented by Senate Bill 136 retroactive. [Citation.] It took effect on January 1, 2022, and added former section 1171.1, now section 1172.75 …." (*Burgess*, *supra*, 86 Cal.App.5th at p. 380.)

Section 1172.75 establishes a mechanism to provide affected defendants a remedy for those legally invalid enhancements, and the resentencing process begins with corrections officials. (*People v. Cota* (2023) 97 Cal.App.5th 318.) "Subdivision (b) of

8.

section 1172.5 directs the Secretary of the Department of Corrections and Rehabilitation (CDCR) and the correctional administrator of each county to 'identify those persons in their custody currently serving a term for a judgment that includes an enhancement described in subdivision (a) and … provide the name of each person … to the sentencing court that imposed the enhancement.' " (*Burgess*, *supra*, 86 Cal.App.5th at p. 380.) "After the trial court receives from the CDCR and county correctional administrator the information included in subdivision (b) of section 1172.75, 'the court shall review the judgment and verify that the current judgment includes a sentencing enhancement described in subdivision (a),' and if so, 'recall the sentence and resentence the defendant.' " (*Ibid.*)

According to defendant's brief, the Secretary of the CDCR advised the trial court in June 2022 that defendant was serving a sentence for a prior prison term that was no longer valid, and he was eligible for recall and resentencing pursuant to the statutory amendments. Defendant further asserted that on remand, the trial court had discretion to dismiss the firearm enhancement as a result of Senate Bill 620, and it should also dismiss the prior strike conviction.

**The Prosecution's Response**

On November 8, 2023, the prosecution filed a reply, supported by documentary exhibits consisting of this court's opinion from the direct appeal and CDCR records.

The prosecution agreed the trial court must dismiss the prior prison term enhancement. The prosecution argued the court should decline to dismiss the firearm enhancement and the prior strike conviction based on defendant's criminal history, the facts of the convictions, and his conduct in prison, based on the supporting documents.

**The Trial Court's Hearing**

On November 28, 2023, the trial court conducted a hearing to recall defendant's sentence, and stated it would strike the prior prison term enhancement. The prosecution objected to further reduction of defendant's sentence because the current convictions

were for "horrible" behavior, "he shot an unarmed man who wasn't expecting it," and killed the man in front of his young son.

The trial court stated that upon recall of defendant's sentence, he was entitled to the dismissal of the prior prison term enhancement and the court had discretion to conduct a full resentencing hearing. In considering whether to further reduce defendant's sentence, the court had discretion to consider all relevant sentencing factors including postconviction conduct, CDCR disciplinary records, and whether there was evidence that defendant's risk for future violence had changed since the original sentencing hearing.

The trial court denied defendant's motion to dismiss or reduce the firearm enhancement because there was clear and convincing evidence that imposing a lesser sentence would endanger public safety. The court stated it did not have discretion to dismiss the prior strike conviction, but it would decline to do so even if it had such discretion because he was not outside the spirit of the Three Strikes law. The court's decision was based on defendant's "terrible" history of family violence that escalated with each offense. The court noted the facts of the murder in this case, defendant's lengthy record of prior convictions, his prior poor performance on probation and parole, and he was on parole when he committed the murder. The court also found he had participated in several programs in the CDCR, but he had violated rules for fighting with another inmate and refusing to appear for a work assignment.

The trial court again sentenced defendant to 25 years to life, doubled to 50 years to life for count 1, plus 25 years to life for the firearm enhancement; and a consecutive term of one year four months for count 2.

On December 8, 2023, defendant filed a timely notice of appeal.

## DISCUSSION

As noted above, defendant's counsel has filed a *Wende* brief with this court. The brief also includes counsel's declaration indicating that defendant was advised he could

file his own brief with this court. By letter on April 24, 2024, we invited defendant to submit additional briefing. To date, he has not done so.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed.